**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA,**<br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY,**<br><br>**MARKWAYNE MULLIN**, in his official capacity as Secretary of Homeland Security,<br><br>**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,**<br><br>**DAVID VENTURELLA**, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,<br><br>**U.S. DEPARTMENT OF JUSTICE,**<br><br>**TODD BLANCHE**, in his official capacity as Attorney General of the United States,<br><br>**FEDERAL BUREAU OF INVESTIGATION,**<br><br>**KASH PATEL**, in his official capacity as Director of the Federal Bureau of Investigation,<br>Defendants. | **Case No.** |

**PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. Plaintiff County Board of Arlington County, Virginia ("Arlington County" or "Arlington") brings this action to protect its ability to administer free and fair elections for its

citizen-voters. Arlington has a fundamental legal duty to protect public safety and to administer peaceful, secure, and efficient elections. In violation of long-settled law, Defendants have decided to authorize armed federal agents to be present at polling sites. That unlawful policy is interfering with Arlington's prerogative to administer its elections and is causing Arlington to bear substantial additional expenses.

2. In 1865, Congress prohibited armed federal agents at the polls. Congress understood, more than 160 years ago, that armed federal agents at polling places imperil the freedom of our elections, and, on penalty of fine and imprisonment, forbade any federal official from ordering or placing "any troops or armed men at the place where any general or special election is held . . . , unless [such force] be necessary to repel the armed enemies of the United States."[1]

3. Nonetheless, over the past year, Defendants have made clear through public statements and on-the-ground enforcement activity that they have adopted a set of policies that authorize armed federal agents to invade polling places—policies that brazenly violate this 160-year-old federal law, usurp local election administration and law enforcement authority, and threaten the integrity of American democracy.

4. Armed federal agents at polling places are likely to disrupt the peaceful exercise of voting rights. They can interfere with smooth administration of local, state, and federal elections by undermining trust in the election; diverting limited local resources; disrupting traffic and pedestrian flows; intimidating voters, election workers, volunteers, residents, and passers-by;

[1] Act of February 25, 1865, Pub. L. No. 38-52, ch. LII, 13 Stat. 437, codified as amended at 18 U.S.C. § 592.

creating commotion and public unrest; and generating increased calls to police, election officials, and other local officials.

5. Likewise, they can frustrate local law enforcement's ability to maintain clear authority over polling places, to enforce local and state law prohibiting firearms at polling sites, and to protect voters from intimidation at polling locations. *See, e.g.*, Va. Code Ann. §§ 24.2-604, 24.2-701.1, 24.2-707.1.

6. The threat that armed agents will be in and around polling places and near ballot dropboxes imposes costs on Arlington and impedes local law enforcement's ability to ensure public safety and maintain order. The threat forces Arlington's local government to plan for and expend resources to address the possibility of unlawful activity and the reasonable fears of voters and election workers. It makes it harder for election officials and law enforcement to do their jobs by injecting a significant risk of dangerous confrontations at polling places and surrounding areas.

7. U.S. citizens have every reason to fear unlawful interactions with armed Immigration and Customs Enforcement ("ICE") agents. In recent years, ICE has unlawfully detained more than 170 U.S. citizens.[2] ICE agents have shot and killed U.S. citizens peacefully exercising their First Amendment rights.[3] And ICE agents frequently stop and question citizens—sometimes detaining them for days—based on racial profiling.[4] Indeed, just weeks ago, in August

---

[2] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM; *see also Vasquez Perdomo v. Noem*, 148 F.4th 656 (9th Cir. 2025) (finding ICE agents had, in multiple instances, detained U.S. citizens by force, and in one instance, taking their Real ID and leaving them vulnerable to the next ICE agent to profile them).

[3] Allison McCann, *At Least 23 People Have Been Shot at by Federal Immigration Agents Since Last Year*, N.Y. Times (July 16, 2026), https://perma.cc/A536-S6ZP.

[4] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM.

2026, a Northern Virginia woman and U.S. citizen was subjected to an ICE traffic stop at gunpoint, only to be released because she had done nothing wrong.[5] These are not isolated incidents but a pattern of reckless disregard for constitutional rights that forces Arlington officials to expend resources to protect voters at the ballot box. Given these many ICE encounters with U.S. citizens, the federal government's defense of the policy to send ICE agents to polling locations—that ICE operations only affect those who cannot legally vote—offers little solace.[6]

8. Arlingtonians, Arlington officials, and County employees thus credibly fear armed federal agents showing up at the polls—and they have made those concerns clear to Plaintiffs through phone calls, community events, and a recent County employee town hall with the County Manager. Residents and County employees want to know what their local government is doing to prepare for the possibility that federal agents with guns will be present at polling places over the course of the next month.

9. As a result, Plaintiffs have had to prepare for this election in unprecedented ways. They have been forced to develop and disseminate new guidance on interactions with federal officials, host a tabletop exercise for local government officials and law enforcement, and run a town hall organized by the Commonwealth's Attorney and the General Registrar to address voters' concerns about encountering armed agents. They have also had to develop a plan for responding to the presence of armed federal agents at polling places—including communications protocols,

[5] Christian Flores, *Woman speaks out after ICE officer pulls out gun during traffic stop*, ABC 7News (Aug. 13, 2026), https://perma.cc/6AFN-HC5H; Video posted by Carolina Molina (@tinyandstrongthings), Instagram (Aug. 10, 2026), https://www.instagram.com/p/Db38N8-J8IN/.

[6] Rebecca Beitsch, *Blanche: 'Why is there objection to sending ICE officers to polling places?'*, The Hill (Mar. 27, 2026), https://perma.cc/S95E-R476.

whether and how to make arrests, and any prosecutorial response or civil legal actions that might be necessary. Arlington has never before needed to prepare for these threat scenarios.

10. Despite the clear prohibition delineated in 18 U.S.C. § 592, Defendants recently declared that they have the authority to send armed federal agents to polling places.

11. Secretary of Homeland Security Markwayne Mullin confirmed, on September 1, 2026, that Department of Homeland Security ("DHS") policy authorizes armed ICE officers to go to polling places to conduct civil immigration and customs enforcement operations.

12. Shortly thereafter, Federal Bureau of Investigation ("FBI") Director Kash Patel confirmed that the FBI likewise takes the position that it has authority to send armed agents to polling places: when asked under oath to confirm that the FBI "w[as]n't going to be sending people to the polls," he responded that this was "just another lie" and that "this FBI is not going to shy away from" securing election integrity.[7]

13. In the months prior to Secretary Mullin and Director Patel's statements, comments from administration officials, actions by federal law enforcement, and evolving official talking points, *see infra* ¶¶ 54–67, had provided strong indications that DHS and DOJ had adopted a policy authorizing armed federal agents at the polls. But Secretary Mullin and Director Patel's articulations and subsequent agency statements have removed all doubt that Defendants claim the authority to send armed federal officers, including ICE and FBI agents, to polling places during the 2026 midterms and future elections to carry out immigration and law enforcement operations—

---

[7] S. Comm. on the Judiciary, *Oversight Hearing: Oversight of the Federal Bureau of Investigation*, (Sep. 15, 2026), https://www.judiciary.senate.gov/committee-activity/hearings/oversight-of-the-federal-bureau-of-investigation-09-15-2026; *see also* Reuters, *LIVE: FBI Director Kash Patel testifies at US Senate hearing*, at 2:21:10–2:21:35 (YouTube, Sep. 15, 2026), https://www.youtube.com/live/36W3fhIB4Bs?t=8434s.

not, as exclusively provided under federal law, "to repel armed enemies of the United States." 18 U.S.C. § 592.

14. Defendants DHS, Mullin, ICE, and Acting ICE Director David Venturella (together, "DHS Defendants") have adopted a policy that authorizes sending armed ICE agents to polling places for the purpose of immigration and customs enforcement, including serving warrants (the "DHS Polling Place Policy").

15. Defendants U.S. Department of Justice ("DOJ"), Todd Blanche, the FBI, and Patel (together, "DOJ Defendants") have adopted a policy that authorizes sending armed FBI agents to polling places for the purpose of election integrity enforcement operations (the "DOJ Polling Place Policy").

16. Both the DHS Polling Place Policy and the DOJ Polling Place Policy (together the "Polling Place Policies") exceed statutory and constitutional authority, violating principles of federalism and the separation of powers.

17. These new policies threaten the ability of state and local governments, like Arlington County, to administer the upcoming election, upending the careful balance set forth in the Constitution between the federal and state governments in overseeing elections. The threat of armed federal agents at polling places forces local governments, like Arlington, to spend resources preparing for the possibility of confrontation with federal agents; makes it more difficult for local law enforcement to maintain order at polling places and maintain trust with their local communities; and blurs the lines of accountability for the presence of armed force at the polls.

18. The DHS Polling Place Policy and the DOJ Polling Place Policy both violate federal law. Both policies authorize armed agents to go to polling places for routine enforcement operations that do not fall within the exclusive exception provided by Section 592: "to repel armed

enemies of the United States." 18 U.S.C. § 592. Defendants' adoption of their respective Polling Place Policies thus violates the express criminal prohibition of 18 U.S.C. § 592.

19. Congress banned armed federal agents at election sites to preserve free and fair elections, the rule of law, the right to vote, and Americans' confidence in the sanctity of the ballot box. Defendants' disregard for that statutory framework threatens the 2026 General Election and all future elections. This Court's review is necessary to declare that the Polling Place Policies violate federal law and the United States Constitution, that under 18 U.S.C. § 592, the federal government may not send armed officers to polling sites, and to vacate the Policies to prevent Defendants from further violating federal law in this or any future election.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

21. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Plaintiffs are located in the Eastern District of Virginia.

## PARTIES

22. Plaintiff County Board of Arlington County, Virginia ("Arlington County" or "Arlington") is a county of the Commonwealth of Virginia. "In Virginia, territorially and politically, counties are integral parts of the State." *Mann v. Cnty. Bd. of Arlington Cnty.*, 199 Va. 169, 173, 98 S.E.2d 515, 518 (1957). Arlington is a continuous and contiguous community located across the Potomac River from Washington, D.C., with no incorporated towns or cities. Arlington has a population of approximately 244,300 residents, approximately 168,513 of whom are

registered to vote.[8] Approximately 41.9 percent of Arlington's population are Persons of Color, and about 32.3 percent of Arlington households speak a language other than English at home.[9]

23. Arlington has a legal duty to determine polling places for local, state, and federal elections in Arlington County by ordinance; administers such elections through its Office of Voter Registration and Elections; operates the local police department and other public safety agencies responsible for ensuring public safety and order, including, if necessary, responding to disturbances or incidents at or near polling places; and provides for the general welfare of the population of Arlington. Multiple components of the government of Arlington County are pertinent to this lawsuit:

a. The County Board is Arlington's legislative body. It is composed of five members, elected at large. The Board appoints the County Manager—Arlington's chief executive and administrative officer—and a variety of citizen boards, commissions, and advisory groups to help develop and implement County policies. The County Board's vision for Arlington is that it "will be a diverse and inclusive world-class urban community with secure, attractive residential and commercial neighborhoods where people unite to form a caring, learning, participating, sustainable community in which each person is important."[10]

b. The General Registrar and Director of Elections ("General Registrar") supervises the Office of Voter Registration and Elections. That office performs the duties prescribed by state law under the direction of the State Board of Elections and the local

[8] Arlington Dep't of Cmty Plan., Hous., & Dev., *Profile 2026*, at 3 (2026), https://perma.cc/2MVY-V9YU; Commonwealth of Virginia, State Board of Elections, *Registrant Counts By Locality: Voters registered as of 9/1/2026*, at 10 (2026), https://perma.cc/NJZ2-CAEZ.

[9] *Profile 2026*, *supra* note 8, at 3, 7.

[10] *County Vision*, Arlington County (2026), https://perma.cc/MB9G-RA98.

electoral board. The General Registrar is the principal staff person for all election issues and is considered an employee of the County pursuant to Virginia Code § 24.2-122. The General Registrar plans and administers local, state, and federal elections in Arlington. In that role, the General Registrar manages voter registration, handles the distribution and collection of mail ballots, oversees Arlington's 24-hour vote drop boxes, and operates early voting locations before Election Day and within each of Arlington's 54 neighborhood precincts on Election Day. The General Registrar provides training to all election officials, including staff, judges, and volunteers who operate polling places in the early-voting period and on Election Day, and it answers questions from voters about registration and voting procedures and locations. It is also responsible for preparing, securing, and counting ballots, and certifying election results to the Virginia State Board of Elections. And the General Registrar publicizes and communicates with Arlington residents about elections, including about when and where they will be conducted and other voting procedures. At its core, the office exists to make voting accessible to all eligible Arlington voters who want to participate and to promote confidence in election integrity.

c. The Arlington County Police Department ("ACPD") is responsible for protecting public safety in Arlington. ACPD's mission is to "reduc[e] the incidence of crime [and] improve[] the quality of life in Arlington County by making it a place where all people can live safely and without fear."[11] The ACPD is composed of approximately 377 sworn officers and 100 civilian members, led by a Chief of Police. Among its public safety responsibilities is to ensure that Arlington voters can cast ballots safely, without fear

[11] Arlington County Police Department, *Annual Report 2025*, at 4 (2026), https://perma.cc/XTX2-KEU6.

or interference, and to respond to public safety emergencies regardless of time, place, or location. In furtherance of those responsibilities, the ACPD conducts regular community engagement activities and works collaboratively with Arlington's diverse community.[12] The ACPD's primary law enforcement partner is the Commonwealth's Attorney for Arlington County and the City of Falls Church.

d. The Commonwealth's Attorney for Arlington County and the City of Falls Church (the "Commonwealth's Attorney") serves as the chief prosecutor for Arlington and the neighboring City of Falls Church.[13] Although the Commonwealth's Attorney is a distinct office under Virginia law, the vast majority of the Commonwealth's Attorney's budget comes from Arlington County funds. The Commonwealth's Attorney has jurisdiction to prosecute local and state crimes committed within Arlington and the City of Falls Church, including election fraud and criminal offenses targeting polling places, voters, and election officials, such as threats, intimidation, and acts of violence. The office's duties include planning for and providing for election safety and security, protecting voter safety, prosecuting election-related crimes, and advising and collaborating with the ACPD and the General Registrar on these matters.

24. Defendant DHS is a federal agency headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

25. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

---

[12] *About: Arlington County Police Department*, Arlington County (2026), https://perma.cc/JGA5-9VNX.

[13] The City of Falls Church, home to approximately 15,159 residents, is within the same judicial district as Arlington and is therefore covered by the same Commonwealth's Attorney.

26. Defendant ICE is a federal law enforcement agency housed under Defendant DHS and headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

27. Defendant David Venturella is the Acting Director of ICE and is sued in his official capacity.

28. Defendant DOJ is a federal agency headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

29. Defendant Todd Blanche is Attorney General of the United States, the chief federal law enforcement officer of the federal government and head of the U.S. Department of Justice and is sued in his official capacity.

30. Defendant FBI is a federal law enforcement agency housed under DOJ and headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

31. Defendant Kash Patel is Director of the FBI and is sued in his official capacity.

**LEGAL FRAMEWORK**

32. 18 U.S.C. § 592 provides:

> Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States, shall be fined under this title or imprisoned not more than five years, or both; and be disqualified from holding any office of honor, profit, or trust under the United States.

33. This provision broadly prohibits any federal official—“military” or “civil”—from ordering, bringing, controlling, or having under their authority any “armed men” at “any place where a general or special election is held.” 18 U.S.C. § 592. Thus, the provision is not limited to orders from military officers or those involving the deployment of military troops. *Id.*

34. This provision reflects congressional concern about the corrosive effect of having federal officers directing armed men to interfere in elections, which undermines both the integrity of our elections and the political neutrality of the military and law enforcement.

35. The bill's sponsor stated that its primary object was to protect "the freedom of the elective franchise," prescribing "punishments for certain persons engaged in the public service who shall in any way interfere with the freedom of election." Cong. Globe, 38th Cong., Sess. 1, Vol. 1, at 101 (Jan. 6, 1864) (statement of Sen. Powell), https://perma.cc/D2B2-7ZUV.

36. A later amendment to Section 592 confirms what the statute's plain text already makes explicit: the only exception to the prohibition on "armed men at any place where a general or special election is held" is to "repel armed enemies of the United States." As originally enacted, the statute contained *two* exceptions: "armed men" could be present at polling places if "necessary to repel the armed enemies of the United States, or to keep the peace at the polls." Pub. L. No. 38-52, ch. LII, 13 Stat. 437 (1865). However, in 1909, Congress specifically repealed the latter exception. Pub. L. No. 350, ch. 321, 35 Stat. 1088, 1092–93 (1909). Other than recodification and technical amendments, the statute has stood in its present form since then, allowing armed men in and around polling places only if necessary to repel armed enemies.

37. The Executive Branch's history of practice confirms this interpretation of Section 592. The Department of Justice's election-law enforcement manual, recently removed from its website, *see infra* ¶ 58, explains the Civil War-era law "makes it a felony for any federal official to send 'armed men' to the vicinity of open polling places."[14] And the Department's internal policy manual includes a provision added in 2022 clarifying that Section 592 "prohibits armed federal

[14] Richard C. Pilger, *Federal Prosecution of Election Offenses*, GPO 9 (8th ed. 2017), https://perma.cc/NU6K-R72C; Craig C. Donsanto & Nancy L. Simmons, *Federal Prosecution of Election Offenses*, at 10 (7th ed. 2007), https://perma.cc/K59Z-7CDX.

presence where elections are held."[15] Department prosecutors and law enforcement agents must consult the Public Integrity Section, which oversees the investigation and prosecution of federal crimes affecting government integrity,[16] whenever "issues arise regarding the presence of armed officials at a location where an election is being held."[17]

38. The Administrative Procedure Act ("APA") holds executive agencies accountable to the rule of law and gives Americans redress when federal agencies take action or make policy that is arbitrary or capricious or contrary to law. 5 U.S.C. § 701, *et seq.* Enacted by Congress shortly after World War II to account for the Executive Branch's expanded powers under the New Deal, the APA strikes a careful balance between executive power and democratic accountability. That balance reflects "the nation's decision to permit extensive government, but to avoid dictatorship and central planning."[18]

39. The APA prohibits federal agencies from taking action that is "arbitrary, capricious, an abuse of discretion, . . . contrary to constitutional right, power, privilege, or immunity . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . without observance of procedure required by law . . . unsupported by substantial evidence . . . [or] unwarranted by the facts." 5 U.S.C. § 706(2).

40. The APA empowers federal courts to hold agencies in check when they make unreasoned, unreasonable, or unlawful decisions: when agencies take such action, it must be held "unlawful and set aside." *Id.*

---

[15] U.S. Dep't of Just., Just. Manual § 9-85.400, https://perma.cc/Y63H-G4LE.

[16] *Public Integrity Section (PIN)*, U.S. Dep't of Just., https://perma.cc/MUD4-CFRZ.

[17] *Supra* note 15.

[18] George B. Shepherd, *Fierce Compromise: The Administrative Procedure Act Emerges from New Deal Politics*, 90 Nw. U. L. Rev. 1557, 1559 (1996).

## FACTUAL ALLEGATIONS

### I. Defendants Confirm a Policy of Authorizing Armed Agents at Polls as Arlington County Administers the Federal Midterm Election.

41. The Arlington County Government is conducting a federal midterm and local election between now and Election Day, November 3, 2026.[19] Voting in Arlington County began on September 18 and will continue through Election Day.[20] The last day to register to vote is October 23; registration can be accomplished online, by mail, or in person at the Arlington Office of Voter Registration.[21]

42. Arlington voters may cast ballots through Election Day (November 3, 2026). Before Election Day, between September 18 and October 31, Arlington voters can cast ballots at one of a number of early voting locations.[22] They can also vote by mail. The General Registrar began mailing ballots to voters 45 days before the election, on or around September 18.[23] October 23 is the last day to request a mail ballot.[24] Voters can return mail ballots in person by 7:00pm on Election Day to one of a number of 24-hour drop boxes located in Arlington or to the General Registrar's office.[25] Voters may also return mail ballots to an early voting location when the location is open, or by mail postmarked on or before November 3 and received by the General Registrar by 12:00pm on November 6.[26] And Arlington voters can vote in person on Election Day at their assigned neighborhood precinct.[27]

---

[19] *Elections*, Arlington County (2026), https://perma.cc/US56-P4GF.
[20] *Id.*
[21] *Id.*; *Register to Vote*, Arlington County (2026), https://perma.cc/MC5X-7F7M.
[22] *Early Voting*, Arlington County (2026), https://perma.cc/LHB2-D7WM.
[23] *Vote by Mail*, Arlington County (2026), https://perma.cc/7K4M-KXLF.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Elections*, Arlington County (2026), https://perma.cc/US56-P4GF.

43. Seventeen days before the start of early voting in Arlington County, on September 1, 2026, Defendant Mullin announced that DHS policy authorizes ICE agents to conduct enforcement activities at polling places under the DHS Polling Place Policy. He stated that ICE agents have authority to go to polling sites for two distinct purposes:

> The only reason why we would be at polling places is if there is a threat to that polling place or we're serving a warrant on someone that we have been actively tracking down. . . . ICE's job is immigration, customs enforcement. That's their job . . . if we're serving a warrant we will be where we need to be.[28]

44. ICE agents are authorized and expected to carry firearms in the performance of their official duties, including when they respond to threats or execute federal warrants, *see* 8 C.F.R. § 287.5(f), making them armed under the meaning of 18 U.S.C. § 592.

45. When asked for more clarity on Defendant Mullin's comments, DHS said in a statement that:

> ICE conducts intelligence-driven targeted enforcement, and if an active public safety threat endangered a polling location, they may be arrested as a result of that targeted enforcement action.[29]

46. DHS Defendants have thus confirmed their adoption of the DHS Polling Place Policy. This policy purports to authorize armed ICE agents to go to polling places to police "threats" and to conduct routine immigration and customs enforcement.

47. On September 10, 2026, four membership organizations and a municipality filed a federal lawsuit in Washington, D.C., under the APA challenging the legality of the DHS Polling Place Policy.[30]

---

[28] Eric Bazail-Eimil, *Mullin says DHS could deploy to polling sites for 'specific' threats, arrests*, POLITICO (Sep. 1, 2026), https://perma.cc/N2VN-HCYJ.

[29] *Id.*

[30] *League of United Latin American Citizens v. Dep't of Homeland Security*, No. 26-cv-3157 (D.D.C. Sep. 10, 2026).

48. Three days after the suit was filed, on September 13, 2026, Fox News mentioned the suit to White House Border Czar (and former acting ICE Director) Tom Homan and asked whether there is "any truth" to "reporting that ICE is going to be raiding polling places." While Homan disclaimed any specific "plan to sweep polling places," he confirmed that DHS claims authority to unlawfully send armed agents to polling places through the DHS Polling Place Policy, asserting that ICE agents would "go where we gotta go to apprehend" "criminal alien[s]." This is Homan's exchange with the Fox reporter:

> HOMAN: Look, I have not seen any operational plans or any discussions on any immigration enforcement operation at polling places. . . . [T]here is no plan for immigration enforcement action at polling places, it's just another attempt to smear ICE and smear the President. . . . And we've seen, look we know illegal aliens have voted. . . . But, I, I want to put that to bed. There's no plan to sweep polling places looking for illegal aliens.
>
> FOX: . . . They're citing this Civil War era law that prohibits bringing troops to places, or 'armed men,' that's the law language, to places where are elections are held. There will be people who even hear your answer there, and say, well, just the threat of it, the idea of it is enough to keep people in fear. **Can you say whether there's been an order for people, for enforcement to stay away from those locations?**
>
> HOMAN: . . . So ICE, look, **there is no sensitive location policy**, there is no sanctuary for a significant public safety threat or a national security threat. **We'll go where we gotta go to apprehend these people.** But ICE are professionals. They try to do things in a professional manner. And not one, now we're arresting people that may have went to church or may have went to the hospital, but we don't do operations at those locations. **If you're a criminal alien, you're a national security threat, there's no sanctuary.** But look at the past two years. Not one instance of ICE operating at a sensitive location. To include polling places.[31]

---

[31] *Tom Homan reacts to Denver lawsuit seeking to block ICE at poll*, Fox News (Sep. 13, 2026), https://www.foxnews.com/video/6405008680112 (emphases added).

Homan's statements demonstrate the administration's continued insistence that polling places, even on Election Day, are fair game for ICE operations.

49. Two days later, on September 15, 2026, Defendant Patel testified before the United States Senate Judiciary Committee that it was a "lie" that the FBI would not be sending agents to the polls. Instead, Defendant Patel stated that, like DHS, the FBI had also adopted a policy of authorizing its special agents—who are authorized and expected to carry firearms during the performance of their official duties[32]—to go to polling places for enforcement operations.

50. When asked whether he could send FBI agents to polling places, Defendant Patel told the Committee, "I don't know that we can't legally do it." When questioned by Senator Peter Welch about whether the FBI would be present at polling places leading up to Election Day, Patel pushed back against Welch's attempt to confirm that FBI agents would not be at polling places, resulting in the following exchange:

PATEL: We have an election crimes community coordinator in all 56 field offices so you bet we're gonna have them there and manning the post for election interference matters.

WELCH: Wait, I thought you weren't going to be sending people to the polls?

PATEL: When did you hear that? It's just another lie.

WELCH: When you answered [Senator Richard] Blumenthal.

PATEL: Nope.

WELCH: So you are sending FBI agents to the polls.

PATEL: We have election crisis coordinators manned at all 56 field offices. Election integrity is of paramount importance. This FBI is not going to shy away from that effort.[33]

---

[32] *What kinds of guns do FBI agents use?*, FBI, https://perma.cc/E77R-68HR.

[33] S. Comm. on the Judiciary, *Oversight Hearing: Oversight of the Federal Bureau of Investigation*, (Sep. 15, 2026), https://www.judiciary.senate.gov/committee-

51. The next day, September 16, 2026, the Arlington Commonwealth's Attorney hosted a tabletop exercise to review protocols for public safety, election security, election integrity, and other governmental responsibilities, based on threats of federal overreach including the Polling Place Policies. Representatives from the Commonwealth's Attorney's Office, the Arlington County Police Department, the County Attorney's Office, and the General Registrar, among others, participated. Because of Defendant Mullin's and Defendant Patel's public announcements, officials prepared for the possibility that armed federal law enforcement agents could be sent to and appear at Arlington polling places during early voting—which was due to begin in just two days—or on Election Day.

52. And the following week, on September 22, 2026, the Arlington Commonwealth's Attorney and the General Registrar held a nonpartisan Voter Safety Community Town Hall, which also addressed Arlington residents' questions arising from the Polling Place Policies and their concerns that armed federal law enforcement agents could be sent to and appear at Arlington polling places.[34]

53. During town halls that the Arlington County Manager convenes for all County employees, employees have raised urgent questions, as recently as October 1, about the prospect of armed federal agents at County facilities, including those serving as polling places, expressing acute concern about potential confrontations with federal law enforcement and the difficult decisions County personnel may be forced to make while carrying out their official duties.

---

activity/hearings/oversight-of-the-federal-bureau-of-investigation-09-15-2026; *see also* Reuters, *LIVE: FBI Director Kash Patel testifies at US Senate hearing*, at 2:21:03–2:21:35 (YouTube, Sep. 15, 2026), https://www.youtube.com/live/36W3fhIB4Bs?t=8434s.

[34] Parisa Dehghani-Tafti, *Commonwealth's Attorney, Elections Office Host Voter Safety Town Hall*, Office of the Commonwealth's Attorney (Aug. 27, 2026), https://perma.cc/RKB4-WM58.

## II. The Trump-Vance Administration Has Deliberately Developed and Implemented the Unlawful Polling Place Policies Over Many Months.

54. The administration developed and began implementing the Polling Place Policies over the past several months, while simultaneously disclaiming the existence of any such policy. But Defendant Mullin and Defendant Patel's statements have confirmed what was apparent from the actions and statements of the administration to date: DHS and DOJ Defendants have adopted a policy that authorizes armed agents to go to and conduct enforcement activities at polling places.

55. On February 3, 2026, former Trump advisor and chief strategist Steve Bannon, in response to President Trump's statement that "Republicans ought to nationalize the voting," said, "We're going to have ICE surround the polls come November. We're not going to sit here and allow you to steal the country again. . . . President Trump has to nationalize the election."[35]

56. On February 5, 2026, when asked whether ICE agents would be sent to polling locations, White House Press Secretary Karoline Leavitt said that she "can't guarantee that an ICE agent won't be around a polling location in November."[36]

57. In March 2026, then-Deputy Attorney General Todd Blanche made clear that the Trump-Vance administration would disregard federal law prohibiting armed federal agents from entering polling places when, in comments to the Conservative Political Action Conference, he stated, "Why is there objection to sending ICE officers to polling places?"[37]

---

[35] Jacob Wendler, *Steve Bannon calls for Trump to deploy ICE and military troops to polling sites*, POLITICO (Feb. 4, 2026), https://perma.cc/E2UV-VUTH (internal quotation marks omitted).

[36] Andrew Feinberg, *White House's chilling warning about midterm elections: 'Can't guarantee an ICE agent won't be around polling locations'*, The Independent (Feb. 5, 2026), https://perma.cc/R499-CRS5.

[37] Forbes Breaking News, *WATCH: Deputy AG Todd Blanche Calls To Deploy ICE Agents To Polling Sites*, at 01:42–01:47 (YouTube, Mar. 27, 2026), https://www.youtube.com/watch?v=6Km1Zvo8bDw; Rebecca Beitsch, *Blanche: 'Why is there objection to sending ICE officers to polling places?'*, The Hill (Mar. 27, 2026),

58. By June, DOJ had pulled from its website a longstanding, publicly available election crimes manual that explicitly stated that federal agents cannot lawfully conduct law enforcement activities at a polling place.[38] The deleted election crimes manual stated that "the federal prosecutor has no authority to send FBI Special Agents or Deputy U.S. Marshals to polling places. In fact, a federal statute makes it a felony for any federal official to send 'armed men' to the vicinity of open polling places." It continued, "[t]he effect of [Section 592] is to prohibit FBI Special Agents from conducting investigations within the polls on election day" and that its prohibition applies generally to "agents of the United States Government."[39]

59. At the same time, DOJ has gutted the Public Integrity Section (PIN), which drafted and maintained the election crimes manual, and oversaw DOJ's enforcement of 18 U.S.C. § 592.[40] Previously, PIN organized an Election Day command center to provide real-time legal advice to law enforcement in the field consistent with the election crimes manual and federal law; this administration appears poised to end that traditional practice.

60. On March 9, 2026, Secretaries of State for nine states wrote to Defendant Mullin, asking him to confirm that there would not be ICE officers at polling places.[41]

---

https://perma.cc/K6VF-3EQB; Jacob Knutson, *Deputy attorney general endorses sending ICE agents to voting sites*, Democracy Docket (Mar. 26, 2026), https://perma.cc/UKZ5-ZNE8.

[38] Letter from Sen. Alex Padilla et al. to Todd Blanche, Acting Att'y Gen. (June 8, 2026), https://perma.cc/YS5Z-X6JN; Office of Sen. Alex Padilla, *Padilla, Durbin, Whitehouse, Colleagues Sound Alarm on Trump Administration Use of Election Crimes Prosecutions to Interfere in Midterm Elections*, Press Release (June 8, 2026), https://perma.cc/9V3T-GZE7.

[39] Richard C. Pilger, *Federal Prosecution of Election Offenses*, GPO 9, 73 (8th ed. 2017), https://perma.cc/NU6K-R72C.

[40] Ryan J. Reilly, Sarah Fitzpatrick & David Rohde, *Justice Department office that prosecutes public corruption slashed in size, sources say*, NBC News (Mar. 11, 2025), https://perma.cc/K3W9-NTFN; *supra* note 15.

[41] Letter from Jena Griswold, Colo. Sec'y of State et al. to Markwayne Mullin, Acting Sec'y of Homeland Security (Mar. 9, 2026), https://perma.cc/RH3X-XKVN.

61. In response, on May 11, 2026, then-Acting ICE Director Todd Lyons conceded that "there is no reason for ICE personnel to be deployed to polling places," while still insisting that ICE "plays an important role in investigating voter fraud and will continue to perform this vital mission."[42]

62. Despite this statement and Homan's claim that there had been "not one" instance of ICE operating at polling places in the past two years, ICE has in fact conducted multiple enforcement operations at polling places.[43]

a. On May 20, 2026, armed ICE agents conducted an enforcement action at an active polling place in San Antonio, Texas, where they "swarmed" the parking lot of the polling site to detain an individual in full view of voters before being directed to leave the premises by the county sheriff.[44]

b. On June 2, 2026, "a couple vehicles worth" of armed ICE agents visited an active polling place in Ventura County, California, during a "crush" of voters.[45] Local election officials and volunteers, who witnessed "masked and vested" agents and reported the incident, noted, "It's very intimidating for someone exercising their right to vote."[46]

c. And on June 23, 2026, ICE agents entered an active polling place in Syracuse, New York, to confront an election volunteer. Reportedly, they were looking to conduct investigative activity regarding a poll worker's social media post five months

---

[42] Letter from Todd Lyons, Acting Dir. of ICE, to Jena Griswold, Colo. Sec'y of State (May 11, 2026), https://perma.cc/2S2T-NK9M.

[43] *Tom Homan reacts to Denver lawsuit seeking to block ICE at poll*, Fox News (Sep. 13, 2026), https://www.foxnews.com/video/6405008680112 (emphases added).

[44] Michael Karlis, *ICE conducts enforcement action at San Antonio voting location, witnesses say*, San Antonio Current (May 20, 2026), https://perma.cc/Z7WT-JRGA.

[45] Wes Woods II, *UPDATED: ICE presence outside Simi Valley vote center raises alarms*, Ventura County Star (June 2, 2026), https://perma.cc/65UZ-XUEA.

[46] *Id.*

earlier about an ICE agent's shooting of Renee Good in Minneapolis—but they waited until the individual was midway through a shift at a polling place within the local library before choosing to confront her.[47]

These incidents make clear that despite the administration's rhetoric, ICE will in fact operate at polling places.[48]

63. Around the same time as the enforcement action at an active polling site in San Antonio, ICE distributed internal talking points under the heading "Hot Topic 14 – ICE's Role in Elections and at Polling Facilities."[49]

64. ICE's heavily-redacted internal talking points, labeled "Hot Topic 14 – ICE's Role in Elections and at Polling Facilities," state:

> **Background:** There have been multiple news stories and inquiries from Members regarding ICE's role in elections investigations. Members have also asked if ICE plans to deploy officers to polling locations during the upcoming mid-term elections.
>
> **Value Statements:**
>
> - There is no reason for ICE officers and agents to be deployed to polling places, unless a threat arises.
> - Homeland Security Investigations conducts investigations into voter fraud, for which we've made numerous arrests.
>
> * * *

---

[47] Jude Joffe-Block, *She posted about ICE. Five months later, DHS agents told her to take her post down*, NPR (June 26, 2026), https://perma.cc/M8JK-H79T.

[48] These incidents took place during primary elections; they demonstrate a pattern of ICE operating at polling places, and make clear that Homan's statement that there was "not one" instance of ICE conducting law enforcement activities at polling places was not true when it was made.

[49] Madeleine Ngo, Richard Fausset & Alexandra Berzon, *Trump Officials Ramp Up Investigations Into Voter Registration Groups*, N.Y. Times (Oct. 7, 2026), https://perma.cc/9HNM-5QPX (linking U.S. Immigration and Customs Enforcement, *Response to ICE FOIA Case No. 2026-ICLI-00100*, at 7 (Oct. 1, 2026), https://perma.cc/TEC2-V32Y).

***If asked*: Will ICE arrest people at polling places? If you are ordered to send ICE personnel to polling places, will you comply with the order?**

[Redacted: **(b)(7)(E)**, large box][50]

65. On September 18, 2026, public reporting revealed that DHS personnel had, sometime last year, "shared a 78-page document listing counties and states that offer election materials and ballots in non-English languages" alongside "a Department of Justice criminal checklist outlining requirements for prosecution of voter-related charges."[51] The list and associated prosecutorial checklist suggests that DHS is targeting polling locations for immigration enforcement based on the purported presence of voters who may benefit from materials in languages other than English.

66. Taken together, these actions make clear that DHS Defendants have developed and acted upon the DHS Polling Place Policy; and that DOJ Defendants have likewise adopted the DOJ Polling Place Policy as a matter of agency policy regarding authority to go to polling locations.

67. Defendants failed to engage in a rational or reasoned process before enacting and announcing their Polling Place Policies. They did not consider any evidence or testimony regarding the effect that authorizing armed federal agents to enter polling places would have on the integrity of federal elections, the ability of states and localities—including Arlington—to conduct them in a free and fair manner, or the fears of voters and election workers in jurisdictions like Arlington County about being confronted by armed federal agents at the polls.

---

[50] *Id.*

[51] Miles Parks, Jude Joffe-Block, & Ximena Bustillo, *A DHS email raises new questions about the Trump administration's election plans*, NPR (Sep. 18, 2026), https://perma.cc/ED68-9ZYE.

## III. The Polling Place Policies Are Intimidating Arlington County's Voters, Forcing Arlington to Respond.

68. The clear contradiction between Defendants' Polling Place Policies and federal law makes clear that ICE and FBI leadership are willing to deploy agents to polling locations without regard for federal law. And these policies suggest that DHS and DOJ may similarly attempt to authorize other enforcement components under their authority to unlawfully go to polling places. Together, they place voters and election workers alike in fear that they will encounter ICE, FBI or other armed federal agents at polling places during the upcoming election and that these agents will disregard their rights the way they have disregarded federal law. These fears are forcing Arlington County to undertake efforts to address residents' concerns and ensure the security of the ongoing election.

69. Residents' fears are well-founded—especially as regards ICE. ICE has repeatedly stopped, seized, and interrogated people based on how they look, what language they speak, and where they work, rather than on individualized suspicion that a particular person lacks lawful status—making clear that U.S. citizenship is no bar to being unlawfully detained and interrogated.

70. In *Vasquez Perdomo v. Noem*, the United States District Court for the Central District of California found that agents conducting "roving patrols" in the Los Angeles area were making stops on the basis of apparent race or ethnicity, spoken language or accent, and the type of work a person appeared to perform, and enjoined the practice. 790 F. Supp. 3d 850, 864, 890, 894 n.33 (C.D. Cal. 2025). The Ninth Circuit denied the government's motion for a stay pending appeal. 148 F.4th 656 (9th Cir. 2025).[52]

---

[52] The Supreme Court later stayed the district court's injunction. *Noem v. Vasquez Perdomo*, 600 U.S. __, 146 S. Ct. 1 (2025). Justice Kavanaugh, concurring, explained that the stay was granted on the basis that plaintiffs likely lacked standing to sustain a broad injunction, and that the government had a "fair prospect" of succeeding on its Fourth Amendment defense—but

71. In particular, the Ninth Circuit credited evidence that armed ICE agents had, on multiple occasions, detained U.S. citizens on the basis of their apparent race or ethnicity, throwing them against walls, telling them to "Shut the f*ck up," and demanding to know what hospital they had been born in. *Id.* at 667–70. In one instance, after ordering one citizen to present identification to prove his claim that he was an American, the agents, armed with "military-style rifles," took his phone, detained him for twenty minutes, and then released him—without ever returning the REAL ID he had given them to prove his citizenship, leaving him vulnerable to the next "roving patrol[]." *Id.* at 667.

72. United States citizenship is thus no guarantee of protection against the threat of being subjected to unlawful federal force and interrogated by armed ICE agents. An investigation by ProPublica identified more than 170 instances of ICE detaining U.S. citizens, where "Americans have been dragged, tackled, beaten, tased and shot by immigration agents."[53] More than 50 of those citizens—nearly all of them Latino—were held after agents questioned their citizenship.[54] And more than 20 were held for more than a day and prevented from calling a lawyer or their loved ones.[55]

73. A Pew Research Center poll published in November 2025 found that over a six-month period, five percent of Latinos surveyed had "been stopped by authorities and asked about

---

he did not question the veracity of the findings that ICE agents had detained U.S. citizens on the basis of apparent race or ethnicity. *Id.* at 1–4 (Kavanaugh, J., concurring). Justice Kavanaugh later clarified that "officers must not make interior immigration stops or arrests based on race or ethnicity. *Trump v. Illinois*, 607 U.S. __, 146 S. Ct. 432, 436 (2025) (Kavanaugh, J., concurring).

[53] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM.

[54] *Id.*

[55] *Id.*

their U.S. citizenship or immigration status"—a rate that remained the same for U.S.-born Latinos as for those who immigrated to the United States.[56]

74. On March 5, 2025, during a large-scale federal immigration enforcement operation in Northern Virginia, ICE agents surrounded the vehicle of Jensy Machado—a naturalized United States citizen and Manassas resident—with their weapons drawn. They ordered him from his vehicle, refused his offers to produce his REAL ID-compliant Virginia driver's license, handcuffed him, and questioned him about how he entered the country. Officers released him only after he was permitted to produce identification.[57]

75. The risk extends to anyone who tries to intervene to help individuals accosted or detained by ICE. ProPublica identified "about 130 Americans, including a dozen elected officials" who have been "accused of assaulting or impeding officers."[58] And ICE officers have wounded or killed multiple U.S. citizens who attempted to assist individuals accosted by ICE.[59]

76. On August 10, 2026, when ICE agents observed Carolina Molina, a U.S. citizen and Northern Virginia resident, watching and recording enforcement activities from her vehicle in a parking lot in Falls Church, Virginia, they conducted a traffic stop and one agent pointed a firearm at her. ICE agents released Ms. Molina after taking her identification information,

---

[56] Carolyne Im & Luis Noé-Bustamante, *Latinos' Experiences with Immigration Enforcement in Trump's Second Term*, Pew Research Center (Nov. 24, 2025), https://perma.cc/QNK2-UABQ.

[57] Jackie Bensen, *'Just following Hispanic people': Citizen detained by ICE questions vote for Trump*, NBC Washington (Mar. 8, 2025), https://perma.cc/J9WR-QARU; Jackie Bensen, *Sen. Warner seeks answers on why ICE detained a US citizen in Manassas*, NBC Washington (Mar. 21, 2025), https://perma.cc/SWG5-N6QC.

[58] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM.

[59] Allison McCann, *At Least 23 People Have Been Shot at by Federal Immigration Agents Since Last Year*, N.Y. Times (July 16, 2026), https://perma.cc/A536-S6ZP.

concluding she had not violated any law. But, in an apparent effort to excuse the ICE agents' dangerous and unwarranted conduct, a DHS spokesperson later threatened that "she could face criminal prosecution as a result of her actions."[60]

77. DHS Defendants are using voter rolls to identify the individuals they are actively tracking down. ICE's own records show that, as of May 25, 2026, HSI had ingested "50.6 million records" from DOJ voter data, and that those "[d]atasets are currently with iLab for secondary enrichment and identification of high-value targets."[61] ICE has described its work to "ingest[] processed voter roll data into the ELITE enforcement system to enhance lead management, analytical review, and investigative tracking."[62]

78. Defendants' use of voter records to identify enforcement targets creates a substantial risk that armed agents will conduct enforcement at places where the 2026 general election is held.

79. The result is that as citizens go to the polls this fall, they are confronted by the possibility of armed force—agents carrying guns who may stop them based on how they look and what language they speak, detain them forcibly, interrogate them, and prevent them from seeking help. Even citizens who are not specifically confronted by ICE agents may be intimidated from voting, or urging or assisting others to vote, by the presence of ICE agents at or near voting sites.

---

[60] Christian Flores, *Woman speaks out after ICE officer pulls out gun during traffic stop*, ABC 7News (Aug. 13, 2026), https://perma.cc/6AFN-HC5H; Video posted by Carolina Molina (@tinyandstrongthings), Instagram (Aug. 10, 2026), https://www.instagram.com/p/Db38N8-J8IN/.

[61] *See supra* note 49, *Response to ICE FOIA Case No. 2026-ICLI-00100*, at 57.

[62] *Id.* at 125.

## IV. The Polling Place Policies Interfere With Plaintiffs' Election Administration and Law Enforcement Responsibilities.

80. The Polling Place Policies have forced Plaintiffs to divert scarce public resources in a time of tight budgetary constraints to prepare for unlawful federal intrusion. Every dollar and hour spent planning for confrontations with armed federal agents is a dollar that cannot be spent on election administration, public safety, or other governmental services. These costs are traceable to the Policies and would be redressed by an order declaring them unlawful and enjoining their implementation.

**The Commonwealth's Attorney**

81. The Arlington Commonwealth's Attorney has undertaken unprecedented efforts to respond to the Polling Place Policies, expending substantial time, money, and other resources. As noted *supra* ¶ 23, Arlington County funds these efforts through the Commonwealth Attorney's budget.

82. The Commonwealth's Attorney is supporting the ACPD and preparing for any necessary prosecutorial response to the possibility that armed federal agents will be sent and appear at Arlington polling places. This is not a possibility for which Arlington has had to prepare in prior elections. And the Polling Place Policies implicate several Virginia criminal statutes the Commonwealth's Attorney enforces, including statutes regulating who may be present at polling places and what activities can be conducted there, such as: Code of Virginia § 24.2-604 ("Polling places; prohibited activities; prohibited area; penalties"), § 24.2-604.5 ("Polling places; presence of additional persons authorized"), § 24.2-607 ("Prohibited conduct; intimidation of voters; disturbance of election; how prevented; penalties"), § 24.2-1005.2 ("Interference with voting"), § 24.2-1006 (Advice or assistance in casting ballot"), § 24.2-1009 ("Stealing or tampering with

ballot containers, voting or registration equipment, software, records or documents"), among other statutes.

83. On September 16, 2026, the Commonwealth's Attorney hosted a tabletop exercise to review public safety, election security, election integrity and other election protocols and roles and responsibilities across Arlington County government. The four-hour tabletop was a direct response to anticipated federal overreach, including federal enforcement actions under the Polling Place Policies announced by Defendant Mullin and Defendant Patel. Five officials from the Commonwealth's Attorney's Office, including the Commonwealth's Attorney, her Chief Deputy, the Director of Conviction Integrity, and a senior Assistant Commonwealth's Attorney, collectively devoted nearly 30 hours to preparing for and conducting the exercise. Approximately a dozen other officials participated in the exercise: four ACPD officials, including the Chief of Police; the County Attorney, a Deputy County Attorney, and an Assistant County Attorney; the General Registrar/Director of Elections; and officials from the court system, the Virginia Attorney General's office, and another Commonwealth's Attorney's Office. The topics addressed at the meeting included procedures for responding to armed federal law enforcement appearing at polling places, including communication protocols, whether the ACPD should conduct arrests, conditions for emergency relocation of polling places due to federal agents preventing voters from casting ballots, response to potential civil unrest, and the circumstances under which the County Attorney would need to seek civil injunctive relief to protect voters, County employees, and the integrity of the County's polling places.

84. On September 22, 2026, the Commonwealth's Attorney, in partnership with the General Registrar, hosted a voter safety town hall meeting for Arlington residents in response to resident concerns about the prospect of armed federal agents at the polls. The town hall brought

together election officials, community leaders, and civic organizations to provide Arlington and City of Falls Church residents with information about their rights, election safety, and voter responsibilities. [63] During the forum, multiple residents asked questions about the Polling Place Policies and expressed fear for their safety and the integrity of the election due to the threat that armed federal agents may appear at polling places. Residents had questions about "[w]hat protections exist for individuals who report ICE intimidation,"[64] "[w]hat happens if [federal agents] refuse [to leave],"[65] and what would happen "if ICE officers are one block away from the polling site?"[66] This forum was a direct response to the threat of federal overreach, including the Polling Place Policies. An engagement specialist for the Commonwealth's Attorney and General Registrar, together with other staff members, spent more than 100 hours planning the event.

85. For each election, the Commonwealth's Attorney typically monitors polling places to provide rapid response to election related emergencies. But faced with the Polling Place Policies and related citizen concerns, the Commonwealth's Attorney has had to double its efforts. For example, since 2020, the Commonwealth's Attorney has deployed two to three attorneys to visit polling places and to be available to election and police officials for rapid response; this year, the Commonwealth's Attorney is deploying six attorneys and partially opening the office on a statewide holiday to staff their front desk for election related complaints and questions.

---

[63] Parisa Dehghani-Tafti, *Commonwealth's Attorney, Elections Office Host Voter Safety Town Hall*, Office of the Commonwealth's Attorney (Aug. 27, 2026), https://perma.cc/RKB4-WM58.

[64] Commonwealth's Attorney Office: Arlington County, *Voter Safety Community Town Hall [LIVESTREAM]*, at 00:39:36 (YouTube, Sep. 22, 2026), https://www.youtube.com/watch?v=GYTYqOhAehY.

[65] *Id.* at 00:50:38.

[66] *Id.* at 00:40:49.

86. Due to increased threats faced and concerns expressed by election workers, which have been amplified due to the Polling Place Policies, the Commonwealth's Attorney has enhanced training for poll workers on how and when to contact the Commonwealth's Attorney for election related emergencies. The Commonwealth's Attorney prepared and distributed a one-page fact sheet and produced a training video that is now mandatory for precinct officials. This training includes information on responding to the presence of armed federal officials at polling places. By Election Day, the Commonwealth's Attorney will have participated in six live trainings for election workers.

**The General Registrar**

87. The Polling Place Policies also interfere with the General Registrar's election administration responsibilities, costing time and money. Already, the General Registrar has been forced to spend dozens of hours responding to the Polling Place Policies, including crafting new trainings for election workers, and planning responses in the event of federal enforcement operations at polling sites.

88. The General Registrar is adapting its public messaging and procedures in response to heightened citizen concern about voter security and intimidation due to the possibility that armed federal agents will be sent to and appear at Arlington polling places. The General Registrar has received numerous calls from Arlington residents expressing concern that the federal government will interfere with the midterm elections based on the Polling Place Policies, and many residents have inquired about alternatives to voting on Election Day. This has prompted the General Registrar to expand its public messaging (including to address flyers posted in Arlington County asking residents to report illegal voting to ICE), attend more public meetings than in past election years, and increase staffing and equipment outlays to accommodate an anticipated

heightened demand for early voting. Overall, the General Registrar is expending substantial effort to adjust messaging and procedures to ensure that concerns over the Polling Place Policies do not prevent eligible Arlington voters from casting a ballot. The General Registrar attended the four-hour tabletop exercise led by the Commonwealth's Attorney on September 16, 2026, described *supra* ¶ 83. Given that this is the fourth election this year, the General Registrar would not typically have attended such an exercise—but given local concerns about the prospect of armed federal agents at polling places, the Registrar was compelled to spend that additional time.

89. The General Registrar collaborated with the Commonwealth's Attorney to plan and conduct the September 22, 2026, town hall described *supra* ¶ 84. The General Registrar has also spent time answering constituent questions about the County's potential legal responses to armed agents at polls.

90. The General Registrar attended another forum on October 14, 2026, hosted by the Lyon Park Civic Association, to address Arlington residents' concerns about voter safety, rights, and responsibilities. Multiple questions about armed agents at polling places and the limits of their lawful authority were raised by constituents.

91. Officials from the office of the General Registrar have also attended numerous meetings and trainings with other jurisdictions to coordinate and collaborate on responding to the Polling Place Policies and any presence of armed federal agents at Arlington polling places, including a tabletop exercise hosted by the Commonwealth of Virginia about planning for various scenarios on Election Day, including the presence of armed federal agents.

92. The General Registrar is planning for the possibility that the presence of armed federal agents at polling locations may interfere with the election and preparing plans to attempt to respond to that scenario. Practical contingency plans are complicated because Arlington has 54

different voting precincts and already devotes almost all of its public schools and community centers to serve as polling places. Additionally, the General Registrar is providing enhanced training to election officials on how to communicate with voters and law enforcement if armed federal agents appear at any polling place, instructions on communicating outward to other officials in the General Registrar's office and other Arlington County Government agencies, and protocols for executing any contingency plan. The General Registrar has not had to make contingency plans like these for any prior election.

93. Like Arlington voters, election workers and volunteers overseen by the General Registrar are intimidated by the risk of armed federal agents where they work. The General Registrar has been forced to account for this fear in its trainings and communications to address specific requests from staff for deescalation trainings to address the presence of an armed federal agent who refuses to leave a polling place.

**The ACPD**

94. The Polling Place Policies also impede the ACPD's local law enforcement responsibilities and have caused it to expend time, money, and personnel resources to adapt.

95. The Polling Place Policies make it harder for the ACPD to ensure the security of Arlington polling places because they cause confusion over whether local or federal authorities have enforcement responsibilities there, and whether or not local law enforcement should defer to federal authorities at those locations. Where the execution of the Polling Place Policies conflicts with Virginia law, it forces the ACPD into a nearly impossible confrontation with federal counterparts. This risk is real and is the subject of planning and adaptation by the ACPD in coordination with the Commonwealth's Attorney and County Attorney, as explained *supra* ¶¶ 82–83.

96. The ACPD's Chief of Police, Deputy Chief of Police, and two other police officials attended the four-hour tabletop exercise led by the Commonwealth's Attorney on September 16, 2026, described *supra* ¶ 83.

97. The ACPD has revised its training and Election Day protocols in response to the Polling Place Policies. First, should armed federal agents appear at Arlington polling places, they risk interfering with the ACPD's ability and responsibility to maintain clear authority and situational control to ensure a smooth election process. The ACPD is training its officers on communication and deconfliction methods to avoid tension with federal officers, and to deal with the attention and commotion that armed federal agents may attract. Second, the ACPD is increasing its staffing plan for Election Day in part to account for elevated tension and to prevent public unrest in response to federal enforcement actions at the polls.

**The County Board**

98. The County Board has received outreach from constituents with concerns about armed federal agents at polling places during the ongoing election, including a request from a local civic association to come speak to their members about the threat of ICE at the polls.

99. On its website, the Arlington County Government publishes election materials and provides links to Virginia Department of Elections applications for voter registration and absentee ballots that are translated from English to Spanish, Vietnamese, and Korean. The Arlington County Election Day Guide also authorizes election officers to provide translation assistance to voters who need it.[67]

---

[67] Arlington County, *Election Day Guide: A manual for the effective operation of polling places*, at 32 (2026), https://perma.cc/7LT8-KW3Q.

100. Based on the recent revelation that DHS has been circulating a list of "counties and states that offer election materials and ballots in non-English languages" alongside prosecutorial materials regarding voter fraud,[68] Arlington reasonably fears and faces a substantial risk that it will be targeted by DHS Defendants for enforcement operations that will interfere with the administration of its elections. Indeed, Arlington has already been publicly singled out as a target of federal immigration enforcement.

101. On September 21, 2026, the House Judiciary Committee issued a report titled "ARLINGTON COUNTY, VIRGINIA: THE DANGEROUS CONSEQUENCES OF SANCTUARY POLICIES."[69]

102. That legally and factually infirm report was issued twenty days after Defendant Mullin announced the DHS Polling Place Policy and three days after public reporting revealed DHS's compilation of jurisdictions, including Arlington, that provide election materials in languages other than English. Taken together, the DHS Polling Place Policy, DHS's targeting of jurisdictions that offer multilingual election materials, and the public designation of Arlington as a so-called "sanctuary" jurisdiction give Arlington concrete reason to believe that DHS Defendants will direct or authorize armed ICE agents to appear at Arlington polling places, pursuant to the DHS Polling Place Policy, during the ongoing election.

---

[68] Miles Parks, Jude Joffe-Block, & Ximena Bustillo, *A DHS email raises new questions about the Trump administration's election plans*, NPR (Sep. 18, 2026), https://perma.cc/ED68-9ZYE.

[69] H. Comm. on the Judiciary, *Arlington County, Virginia: The Dangerous Consequences of Sanctuary Policies*, (Sep. 21, 2026), https://perma.cc/QM6C-KU8Y.

## CLAIMS FOR RELIEF

**Count I**
**APA, 5 U.S.C. § 706(2)(A):**
**Arbitrary and Capricious and Contrary to Law**
*All Defendants*

103. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

104. Both sets of defendants, DHS Defendants and DOJ Defendants, as confirmed through public statements, have each adopted their own versions of a new Polling Place Policy that authorizes armed federal agents, including ICE and FBI agents, to go to places where voters cast their ballots for the purpose of conducting routine immigration, customs, or law enforcement.

105. These Policies are not tentative: they have been announced with clarity by both DHS and DOJ Defendants. For DHS's part, ICE agents have already acted pursuant to the policy on multiple occasions. These twin policies definitively purport to determine the legal authority of ICE and FBI agents to go to polling places as necessary for routine immigration, customs, or civil law enforcement, which has legal consequence for voters as they head to the polls in the coming weeks, and as a consequence for municipal officials as they prepare to and administer the election. Both the DHS and DOJ Polling Place Policies thus constitute final agency action within the meaning of 5 U.S.C. § 704.

106. Defendants adopted the Polling Place Policies without any reasoned analysis. Defendants failed to engage in a reasoned decision-making process before enacting and announcing their respective Polling Place Policies. Neither DHS nor DOJ Defendants sought feedback or public engagement, considered the likely effect of authorizing armed federal agents to go to places where elections are held, including the potential violation of state law, or explained their decisions.

107. Both Polling Place Policies conflict directly with 18 U.S.C. § 592's express prohibition on ordering, bringing, keeping, or having under federal authority or control armed officers at polling locations for any reason other than repelling armed enemies of the United States.

108. For these reasons, both the DHS and DOJ Polling Place Policies are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). They should, accordingly, be held unlawful and "set aside." *Id.* § 706(2).

**Count II**
**APA, 5 U.S.C. § 706(2)(C):**
**In Excess of Statutory Authority or Limitation**
*All Defendants*

109. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

110. Both the DHS and DOJ Polling Place Policies directly conflict with 18 U.S.C. § 592's express prohibition on ordering, bringing, keeping, or having under federal authority or control armed agents at polling locations for any reason other than repelling armed enemies of the United States.

111. The Polling Place Policies thus exceed the scope of Defendants' statutory authorization or limitations.

112. Defendants' authority to conduct enforcement operations, including serving warrants, detaining individuals suspected of being unlawfully present under federal immigration law, or conducting election integrity investigations, is limited by federal law, including 18 U.S.C. § 592.

113. Defendants' announcements of the Polling Place Policies make clear that they intend to authorize or direct armed federal agents, including but not limited to ICE and FBI agents, to go to polling places. That exceeds the clear limitation of 18 U.S.C. § 592 that armed individuals

may only be permitted at polling places for the purpose of repelling armed enemies of the United States.

114. For that reason, each Polling Place Policy is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C). They should, accordingly, be held unlawful and "set aside." *Id.* § 706(2).

**Count III**
**Tenth Amendment**
*All Defendants*

115. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

116. The Constitution reserves to the States the sovereign authority to administer their own elections. In Virginia, that authority has been delegated in part to Arlington County. When armed federal agents announce they will unlawfully appear at polling places, they displace local officials' authority and usurp a power the Constitution entrusts to them. Defendants' Polling Place Policies inflict a structural injury on our federal system by blurring the lines of accountability and overstepping the bounds of authority, forcing Plaintiffs to bear the costs of Defendants' lawless conduct and running afoul of federalism.

117. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Through this amendment, the Framers intended the States to "keep for themselves . . . the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991) (cleaned up).

118. When the federal executive, without constitutional or statutory authorization, intrudes upon the prerogative of the states to regulate elections pursuant to constitutional right and according to the will of their respective electorates, it blurs the lines of responsibility between the

federal and state governments. "Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation." *New York v. United States*, 505 U.S. 144, 169 (1992).

119. Defendants, all executive branch agencies and officials, have no enumerated power to regulate elections administration. Nor have they been authorized by Congress to do so.

120. Where Congress does wish to regulate in an area where States have primary responsibility, such as the manner of elections, it must do so clearly and in unmistakable terms. *See Gonzales v. Oregon*, 546 U.S. 243, 274 (2006); *Bond v. United States*, 572 U.S. 844, 857–60 (2014); *Ashcroft*, 501 U.S. at 460–61.

121. Here, Congress has in fact spoken unmistakably: it has prohibited the precise authority Defendants claim. *See* 18 U.S.C. § 592. And Congress was careful to provide that only *federal* officials are prohibited, under Section 592, from authorizing armed agents to go to polling places, leaving to the States and their subsidiary local governments the power to police polling places.

122. The presence of federal armed agents at polling places—where state and local governments hold primary responsibility—inflicts exactly the accountability injury outlined in *New York v. United States*. 505 U.S. at 169. Local residents encountering armed agents at the ballot box may (despite Plaintiffs' efforts to distance themselves from Defendants' plans) reasonably but incorrectly infer that Plaintiffs are enabling or condoning federal agents' activities. Voters may perceive this federal presence as a failure by Arlington County to ensure the safety and orderly administration of the polling place. The County therefore would bear institutional responsibility for conditions it did not create and cannot control.

123. Moreover, the presence of armed federal agents at polling places violates Virginia law, demonstrating Defendants' disregard for Virginia law and local ordinances implementing it. *See* Va. Code Ann. § 24.2-604 (prohibiting firearms within 100 feet of polling places).

124. The Polling Place Policies therefore injure Plaintiffs in violation of the Tenth Amendment by claiming an authority reserved to the States and burdening Plaintiffs with the institutional consequences of their unlawful policies.

**Count IV**
**Declaratory Judgment Act**
*All Defendants*

125. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

126. Plaintiffs are entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Plaintiffs and the Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that (1) Defendants lack lawful authority to order, bring, keep, or maintain armed agents at any place where a general or special election is held, because Congress has prohibited such conduct in 18 U.S.C. § 592; and (2) any deployment of armed federal officers to polling places under the Polling Place Policies is therefore unlawful and beyond Defendants' statutory authority.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

127. Declare unlawful, set aside, and enjoin the Polling Place Policies adopted by both DHS Defendants and DOJ Defendants;

128. Declare that Defendants lack lawful authority to order, bring, keep, or maintain armed officers at any place where a general or special election is held, because Congress has prohibited such conduct in 18 U.S.C. § 592;

129. Enjoin Defendants, their officers, agents, employees, and all persons acting in active concert with them, from ordering, bringing, keeping, or having under their authority or control any armed personnel at any place where a general or special election is held in Arlington County, including polling sites, early-voting sites, dropboxes, and curbside voting locations, unless necessary to repel armed enemies of the United States;

130. Award costs and reasonable attorneys' fees incurred in this action; and

131. Grant such other relief as the Court may deem just and proper.

Dated: October 20, 2026

Respectfully submitted,

/s/ *Ryan Samuel*

Ryan Samuel (VA Bar No. 844000)
County Attorney
Dahoud Askar (VA Bar No 102727)
Deputy County Attorney

2100 Clarendon Boulevard, #403
Arlington, Virginia, 22201
703-228-3100
703-228-7106 (fax)

rsamuel@arlingtonva.us
daskar@arlingtonva.us

/s/ *Joseph Cooney*

Joseph Cooney (VA Bar No. 68056)
Orlando Economos*
Ronald A. Fein*
Briana M. Clark*
Brian D. Netter*
Michael J. Gaffney*
Molly Gaston* (VA Bar No. 78506)

Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

jpcooney@democracyforward.org
oeconomos@democracyforward.org
rfein@democracyforward.org
bclark@democracyforward.org
bnetter@democracyforward.org
mgaffney@democracyforward.org
mgaston@democracyforward.org

*/s/ Toby R. Merrill*
Toby R. Merrill†*
Cassandra Crawford††*
Graham Provost‡*
Kyra Sikora*

Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788

toby.merrill@publicrightsproject.org
cassandra.crawford@publicrightsproject.org
graham.provost@publicrightsproject.org
kyra.sikora@publicrightsproject.org

* *Motion for admission pro hac vice forthcoming*
† *Licensed in Massachusetts and New York. Not licensed to practice law in California.*
†† *Licensed in North Carolina. Not licensed to practice law in California.*
‡ *Licensed in Washington, D.C. Not licensed to practice law in California.*

*Counsel for Plaintiff County Board of Arlington County, Virginia*